UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

EDWARD MILES, JR.,                     )
                                       )
          Plaintiff,                   )
                                       )
     v.                                )   Case No. 4:12CV1158 RWS/FRB
                                       )
CAROLYN W. COLVIN,[1] Commissioner     )
of Social Security,                    )
                                       )
          Defendant.                   )

REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

     This matter is before the Court on plaintiff Edward
Miles's appeal of an adverse decision of the Social Security
Administration.    All pretrial matters were referred to the
undersigned United States Magistrate Judge pursuant to 28 U.S.C. §
636(b) for appropriate disposition.

              I.    Background and Procedural History

     In   September   of   2009,   plaintiff   Edward   Miles
("plaintiff") applied for Supplemental Security Income ("SSI")
under Title XVI of the Social Security Act ("Act"), alleging that
he was disabled as of July 2005.     (Administrative Transcript

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social
Security on February 14, 2013.  Pursuant to Rule 25(d) of the
Federal Rules of Civil Procedure, Carolyn W. Colvin should
therefore be substituted for Michael J. Astrue as the defendant
in this case.  No further action needs to be taken to continue
this suit by reason of the last sentence of 42 U.S.C. § 405(g).

("Tr.") 99-101).[2]  Plaintiff's application was initially denied, and he requested a hearing before an administrative law judge ("ALJ") which was held on October 1, 2010. (Tr. 22-49).   On July 14, 2011, the ALJ issued a decision in which he determined that plaintiff was not disabled under the Act.  (Tr. 8-16).  Plaintiff sought review from defendant Agency's Appeals Council, which denied his request for review on May 15, 2012.  (Tr. 1-3).  The ALJ's decision thus stands as the Commissioner's final decision subject to review by this Court under 42 U.S.C. § 405(g).

Plaintiff was born in 1957, and was 52 years old when he applied for benefits.  (Tr. 46).  The record indicates that plaintiff was separated, and had eight children. (Tr. 199).  He graduated from high school, and attended some college.  (Tr. 142, 207).  He did not attend special education classes.  (Tr. 142). The record indicates that plaintiff has a history of criminal convictions and incarcerations for charges of robbery, burglary, stealing, and non-payment of child support.  (Tr. 243). Plaintiff's earnings record documents that, between 1978 and 2009, he worked 45 quarters out of a possible 132, and earned $44,982.92 during his lifetime.  (Tr. 123).

## II.    Evidence Before The ALJ

### A.   Plaintiff's Testimony

During the administrative hearing, plaintiff testified

---

[2]Plaintiff has filed numerous previous applications for benefits.  (Tr. 102).  Defendant Agency's Office of the Inspector General conducted a fraud investigation into plaintiff's October 2006 application.  (Tr. 105).

that he lived with his sister and had no income, and while he could not remember what his last job was, he did remember that he was discharged for "failure to apply by the rules." (Tr. 22). Later in the administrative hearing, plaintiff testified that he had worked as a porter, cashier, and apparently a janitor, but that the janitor position was the only one he had held on a full-time basis. (Tr. 34). Plaintiff testified that he did not drive and did not have a driver's license because "[i]t got took [[sic] for child support" in 2009. (Tr. 26). He testified that he was a smoker. (Tr. 29).

When asked why he could not work, plaintiff replied, "[c]an't function right, sir. And just my mind goes blank a lot." (Tr. 22). He testified that following the rules was still a problem for him, and that he was so forgetful when going to the store that he would forget two items from a four or five-item list. (Tr. 25-26). He stated that depression and anxiety prevented him from working, as well as the embarrassment of being unable to remember "some of the easy tasks that they ask me to do." (Tr. 26-27). Under questioning from the ALJ, plaintiff testified that his trouble with employers occurred during times he was using heroin "[o]ff and on." (Tr. 28). Plaintiff testified that being around people made him feel worse, and lying in his room made him feel better. (Tr. 29).

Plaintiff testified that he was undergoing treatment with Dr. Larichi for schizophrenia and depression. (Tr. 22-23). He stated that he saw Dr. Larice every three months, and saw a

counselor at the Hopewell Center every month. (Tr. 26). He testified that he used to hear voices and think people were out to get him, and that he did not like to be around people because he felt that everyone was out to harm him. (Tr. 23). He stated that he was taking medicine, and that since he had been taking it, his symptoms of paranoia were eased, he heard voices "maybe once every two months, maybe," and did not hallucinate. (Tr. 25).

Plaintiff testified that he sat in his bedroom watching television all day long, seven days per week, unless his sister sent him to the store, which occurred approximately once per week, or unless he went to "stand on the front or sit on the back." (Tr. 23-24). He did not attend church or any kind of group meetings, and did not have any hobbies. (Tr. 27). Plaintiff testified that he cleaned up his room and bathed every other day. (Tr. 24, 27). He testified that he slept for four or five hours per night. (Tr. 27-28).

Plaintiff testified that he stopped using heroin when he was incarcerated the most recent time. (Tr. 28). Plaintiff denied using heroin or other illegal drugs or alcohol since that time. (Id.)

The ALJ asked plaintiff whether he periodically stopped taking his medication, and plaintiff testified that he took his medications faithfully as prescribed. (Tr. 32). When the ALJ asked plaintiff about a doctor's report that indicated that plaintiff had stopped taking his medications for three weeks, plaintiff replied that he did not remember. (Id.) Plaintiff did

testify that he had refused lab testing at a clinic for pneumonia because his condition had improved. (Id.)

The ALJ also heard testimony from plaintiff's sister, Patricia Oliver. Ms. Oliver testified that she was 59 years of age, had an eleventh-grade education, and was a homemaker. (Tr. 30). She testified that plaintiff, her younger brother, had been living with her since his release from jail. (Id.) She testified that she was concerned for the following reasons: people were afraid of plaintiff; he did not talk to anyone; he stayed in his room all day and all night watching television and smoking cigarettes and did not leave except to get something to eat or go to the bathroom or "step on the front porch or the back;" he talked to himself and made noises; he could not remember things; and was not sociable. (Tr. 30-31). Ms. Oliver testified that plaintiff was not "going to do nothing to nobody" but that he "just has got a problem right now." (Tr. 32).

The ALJ heard testimony from Julie Svec, a vocational expert (also "VE"). The ALJ asked Ms. Svec to assume a hypothetical individual of plaintiff's age and education who was limited to simple, routine work with only occasional changes in a routine work setting, and only occasional interaction with the public, co-workers, and supervisors, and asked Ms. Svec whether there were any jobs that such an individual could perform. (Tr. 34-35). In response, Ms. Svec testified that there were a number of unskilled jobs that would fit under that definition, including cleaner, poultry laborer, and laundry worker, all of which were

classified as unskilled, medium work.

    B.  Medical Evidence

        1.  Missouri Department of Corrections Mental Health

        The following treatment records were generated while plaintiff was incarcerated in the Missouri Department of Corrections.  On November 30, 2005, plaintiff underwent an intake mental health evaluation and reported that he had a history of psychiatric treatment, but was not presently taking psychotropic medications. (Tr. 195).  Plaintiff reported that he had injected heroin on a daily basis for 23 years, and that his last use was 2 weeks ago.  (Id.)  He reported that he once tried to overdose on heroin.  (Id.)  It was noted that, during the interview, plaintiff did not show signs of acute psychosis, active mania, or severe depression.  (Id.)

        On December 23, 2005, plaintiff complained about sleep difficulties, stating that he sometimes could not get to bed until 1:30 a.m.  (Tr. 196).  Plaintiff also reported that he was experiencing stress because he was expected to pay child support for a child he was not sure was his own, and that he looked forward to having paternity testing performed.  (Id.)  Plaintiff reported that he was looking forward to getting a job upon release from prison.  (Id.)  Plaintiff reported that being around a "lot of people" bothered him because "they turn on one another."  (Id.)

        Upon examination, plaintiff did not show signs of acute psychosis, active mania, or depression.  (Tr. 196).  It was noted that plaintiff was oriented, maintained appropriate eye contact,

smiled appropriately, was serious but not depressed, and had a normal memory, logical and goal-directed speech, no signs of mania, psychosis, depression, or suicidal ideation. (Id.)

Plaintiff was next seen on August 20, 2007, at which time he reported that he had not been taking medication because he could not afford it. (Tr. 197). Due to plaintiff's report of hearing voices telling him to jump from his bunk or hit his head, he was placed on "suicide watch." (Id.) The following day, when plaintiff was seen in the suicide watch cell, plaintiff immediately asked to be let out, stating that he felt okay. (Tr. 198). It was noted that his mood and affect were neutral without indicators of serious depression, his speech was relevant and focused, he was talkative and made appropriate eye contact, and he smiled and asked very nicely to be let out of the suicide watch cell. (Id.)

On August 22, 2007, plaintiff was noted to have a "light and pleasant" mood and affect, and was observed to be laughing and asking politely to be let out of the suicide watch cell. (Tr. 199). He was oriented and alert, he was relaxed with a cooperative demeanor, and was "easy to work with." (Id.) On August 23, 2007, plaintiff was noted to be emotionally and mentally stable. (Id.) On August 30, 2007, plaintiff reported that he had psychiatric problems dating back to his early 40s, when he began experiencing depression, hearing voices, and feeling paranoid. (Tr. 200). Upon examination, he was noted to be alert, cooperative, and neat in his appearance. (Id.) His thoughts had a normal flow and content. (Id.) He was diagnosed with major depression and hypertension, and

given Loxapine[3] and Fluoxetine.[4]  (Id.)

On August 31, 2007, plaintiff reported that he was separated, and had eight children. (Tr. 199).  He reported that he had one year of college, and had last worked as a cashier in a school cafeteria.  (Tr. 200).  Upon examination, his mood was depressed, his insight/judgment was fair, and his intellect was average. (Id.)

On September 4, 2007, plaintiff reported feeling "fine," sleeping okay, and eating well.  (Tr. 201).  Plaintiff reported that he had no trouble getting along with others.  (Id.) He stated that he had a chronic headache and blurred vision.  (Id.)  Upon examination, plaintiff's mood was neutral and stable, his speech was relevant and focused with organized thoughts, his demeanor was relaxed and comfortable, and there were no signs of memory deficit, psychosis, mania or depression.  (Id.)

On September 12, 2007, plaintiff reported that his medications were not helping, and stated that he wanted them adjusted.  (Tr. 201).  Plaintiff reported experiencing depression and stated that he felt alone, but that he sometimes felt better when he was alone and quiet.  (Tr. 202).  He reported that he got along with people his own age, but did not like the younger inmates

---

[3]Loxapine is used to treat the symptoms of schizophrenia. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682311.html

[4]Prozac, or Fluoxetine, is used to treat depression, obsessive-compulsive disorder, some eating disorders, and panic attacks. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a689006.html

because they were disrespectful and too loud. (<u>Id.</u>) Plaintiff later stated that he was taking his medications, and that they were helping him to feel better. (<u>Id.</u>) On October 5, 2007, plaintiff reported that he was having trouble sleeping, and had headaches. (Tr. 204). He reported that he could not find employment and was willing to do almost anything, stating that he had performed jobs such as digging ditches. (<u>Id.</u>) Plaintiff was observed to exhibit signs of depression, and perhaps some anxiety. (<u>Id.</u>)

On October 25, 2007, plaintiff complained of stomach problems, and attributed them to headache medicine. (Tr. 205). He reported that his psychiatric medications helped. (<u>Id.</u>) He reported no new mental health issues. (Tr. 206). His mood was good, his affect was pleasant, his speech was rational, relevant and focused, he made appropriate eye contact, and he conversed easily. (<u>Id.</u>)

On November 9, 2007, plaintiff reported that his medications were helping his symptoms of hallucinations and depression. (<u>Id.</u>) He reported that he had used heroin for 26 years, the last time on July 25, 2007. (<u>Id.</u>) He stated that he wanted to continue his current medications. (Tr. 206).

On December 3, 2007, plaintiff reported that he had been hospitalized at "Metro Psych" in St. Louis in 2004 and 2005 after driving his car into a lake, and overdosing on heroin. (Tr. 207). On December 5, 2007, he reported that Prozac and Loxapine were helping him. (Tr. 207-08). On January 14, 2008, he was observed to be alert with a normal, non-depressed mood and congruent affect,

and to exhibit logical, goal-directed speech, good eye contact, and intact insight and judgment. (Tr. 208).

Plaintiff did not appear for a scheduled January 18, 2008 appointment. (Tr. 209). On January 25, 2008, plaintiff reported that he was doing fine with his medications, that they were effective and caused no side effects, and that he wanted to continue them. (Id.) It was noted that plaintiff spent his time working in the laundry, sleeping, and reading books. (Id.) On March 7, 2008, plaintiff reported doing okay, and stated that his medications helped with depression, auditory hallucinations, and sleep, and caused no side effects. (Tr. 210). His Global Assessment of Functioning ("GAF") was assessed at 75. (Id.) He did not appear for his next three consecutive scheduled appointments. (Tr. 210-11).

On April 10, 2008, plaintiff denied any present problems, described his mood as "pretty good," and reported that his medications were "fine so far." (Tr. 212). He reported that he did not work prior to his term of incarceration "because he was trying to get his disability for 'stress and depression.'" (Id.) He denied having any depression, and was hoping to get work release once eligible. (Id.) He reported that he had one year of college in accounting and bookkeeping, and had contemplated working as a mortician. (Id.) On May 4, 2008, plaintiff reported being a handyman by trade. (Tr. 212-13). He reported that he had a good childhood and that he had been raised by both of his biological parents, but that the "wrong friends" caused him to begin taking

drugs. (Tr. 213). He identified improvement with his current medications. (Id.) On May 13, 2008, he was cooperative and pleasant, and reported that he had been keeping busy and sleeping in order to cope with stress. (Tr. 214). He reported that his mood was "pretty fair" and that his medications were working "pretty much." (Id.) He did not show up for his next appointment. (Tr. 215). On June 23, 2008, he reported that he had been feeling pretty good. (Tr. 217). On July 18, 2008, he reported that his medications were "working pretty good" and causing no side effects, and he was noted to be compliant. (Tr. 218). On July 30, 2008, he reported that he was fine, but it was noted that he was not conversant and had a flat affect. (Tr. 218-19). When asked what he had done when he was out on the street, he replied that he sat at home and enjoyed being alone. (Id.) On August 31, 2008, his condition was improved, and he stated he had improved on his medications. (Tr. 219). He reported that he kept to himself and had few activities. (Id.) On September 2, 2008, he reported that he had slept all day, and was observed to be stiff and emotionless. (Tr. 221). On October 28, 2008 he was cooperative, and set a goal to address the problem of needing a job. (Id.) On November 3, 2008, he reported feeling stable on his current medications, and reported working in the kitchen and spending his spare time sleeping. (Tr. 222). It was noted he would be released in two months. (Id.)

On November 21, 2008, plaintiff was asked about his plan to find a job upon his release from prison, and plaintiff reported

that he was not doing much so far.  (Tr. 224).  He reported that he was limited in his ability to lift, and could not stand for longer than 15 minutes.  (Id.)  He described his medications as "pretty good" and his mood as "fine," and stated he was having no problems.  (Id.)

On December 11, 2008 he was seen for discharge, and reported that he planned to live with his sister.  (Id.)  He reported that his main concern was getting a job, stating that he was worried he would be revoked for failing to pay child support if he could not get a job.  (Tr. 224).  He stated that he may be able to get a job working with his nephew.  (Id.)

An appointment was scheduled for plaintiff at the Hopewell Center, he was reminded to get a 30-day supply of his medications upon release, and he was given a list of places to obtain free prescription medication.  (Id.)  It was noted that he appeared to be doing better than in prior sessions.  (Id.)  On December 29, 2008, he stated that he felt his medications were working for him, and denied any psychotic symptoms.  (Tr. 225).

## 2.  Other Medical Records

Records from St. Louis University Hospital indicate that plaintiff was seen on March 31, 2009 with complaints of a headache that had persisted for one month.  (Tr. 228).  It was noted that plaintiff smoked one-half of one pack of cigarettes per day.  (Id.)  Neurological examination was positive for headache, but was negative for altered mental status, dizziness, gait disturbance, tingling, tinnitus, tremor, visual changes, and weakness.  (Tr.

229). It was noted that all other systems were negative. (Id.) Plaintiff was diagnosed with hypertension and discharged to home in stable condition with instructions on hypertension, and a prescription for Clonidine.[5] (Tr. 230).

Records from the Hopewell Center indicate that plaintiff was seen in early March 2009 with complaints of episodic difficulty with depression and sleep. (Tr. 239-40, 242-46). He was acceptably groomed. (Tr. 239). He reported being on parole, reported having been referred by the Algoa Correction Center, and reported recent activity with substance abuse. (Tr. 239, 242). His speech was coherent, and his eye contact was adequate. (Tr. 239-40). His thought associations were relevant, and his affect seemed harmonious with his thought content. (Tr. 245).

Plaintiff returned to Hopewell on May 28, 2009 and was seen by Rolf Krojanker, M.D. with complaints of depression, nervousness, sleep trouble, and "voices off and on" telling him to hurt the boyfriend of his sister, with whom he lived. (Tr. 241). Dr. Krojanker's assessment was schizoaffective disorder with heroin dependence, which he last had two weeks ago; partial compliance; hypertension; and psychosocial stressors. (Id.) In June of 2009, plaintiff presented to Hopewell and was noted to be adequately groomed and attired, with coherent speech and adequate eye contact. (Tr. 238). He denied desire to harm himself or others. (Id.) He returned in November of 2009, and denied ideation of hurting

_____

[5]Clonidine is used to treat high blood pressure. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682243.html

himself or others.  (Tr. 282).

On December 15, 2009, plaintiff was seen by Georgia Jones, M.D., for consultative examination.  (Tr. 249).  Plaintiff reported that he was presently out of medication, and had been since May.  (<u>Id.</u>)  Plaintiff reported feeling social isolation, fatigue, and uselessness, and reported that he slept three to four hours per night, had a poor appetite and poor focus and concentration, and heard voices telling him to take care of himself and not speak to strangers.  (Tr. 249-50).  Plaintiff reported that he first used heroin at age 19, and last used it in 2007.  (Tr. 250).  Dr. Jones noted that plaintiff was "supposed to be on" Fluoxetine, Seroquel,[6] and Loxapine.  (<u>Id.</u>)  Plaintiff reported that he had two children, ages 23 and 24.  (<u>Id.</u>)  He reported that he last worked as a cashier, and had worked for one month "and then the child support issue came up."  (<u>Id.</u>)

In the context of performing a mental status examination, Dr. Jones wrote: "[t]his examiner had the feeling that this gentleman was exaggerating his symptoms and was playing with me with trying to read me and give me the answers I wanted about his psychiatric symptoms."  (Tr. 250).

Dr. Jones noted that plaintiff was clean, neat, and appropriately groomed.  (<u>Id.</u>)  She noted that plaintiff had fair

---

[6]Seroquel, or Quetiapine, is used to treat the symptoms of schizophrenia, and episodes of mania or depression in patients with bipolar disorder. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/ a698019.html

eye contact, moved fluidly and easily, was coherent, relevant and logical in his answers, and had reasonable speed, quantity, quality and productivity to his speech. (Tr. 250-51). Regarding plaintiff's cooperation with her, Dr. Jones wrote: "I believe he was cooperative, to an extent, with the examining physician, but I believe that he had an agenda." (Tr. 250). Plaintiff described his mood as depressed and stated that he did not like to be around people, but Dr. Jones noted that plaintiff was able to interact appropriately with the staff and with her. (Tr. 251). He was able to care for his personal needs, and he had good concentration, persistence and pace throughout the examination. (Id.) Dr. Jones diagnosed plaintiff with heroin dependence in remission; psychotic disorder not otherwise specified; personality disorder not otherwise specified, and financial stress. (Tr. 252).

On January 11, 2010, John Herberger of the St. Louis DDS office performed a case analysis and noted that plaintiff had had no treatment since the hearing denial, did not take medication for hypertension, and made no limiting statements on his activities of daily living form regarding hypertension. (Tr. 253).

On January 20, 2010, Robert Cottone, Ph.D. completed a Psychiatric Review Technique form. (Tr. 254-65). Dr. Cottone assessed a mild restriction of activities of daily living, and moderate restrictions in terms of social functioning, and concentration, persistence or pace. (Tr. 262). He opined that plaintiff could remember locations and work-like procedures and understand, remember and carry out short and simple instructions.

(Tr. 266).  Dr. Cottone noted that, while plaintiff reported that
he saw a psychiatrist at Hopewell, the records indicated that
plaintiff had not been seen since the hearing denial.  (Tr. 264).
Dr. Cottone also noted that plaintiff reported that he had been out
of medications since May of 2009.  (<u>Id.</u>)

Also on January 20, 2010, Dr. Cottone completed a Mental
Residual Functional Capacity Assessment and opined that plaintiff
was markedly limited in his ability to understand, remember and
carry out detailed instructions; moderately limited in his ability
to maintain attention and concentration for extended periods,
perform activities within a schedule and maintain regular
attendance and be punctual, sustain an ordinary routine without
special supervision, work in coordination with or proximity to
others without being distracted by them, complete a normal
workweek, interact appropriately with the public, accept and
appropriately respond to criticism, get along with coworkers,
maintain socially appropriate behavior and appearance, travel in
unfamiliar places or use public transportation, and set realistic
goals.  (Tr. 266-67).  Dr. Cottone opined that plaintiff was not
significantly limited in all other areas.  (<u>Id.</u>)  Dr. Cottone
concluded that allegations that plaintiff was severely limited were
not supported by the medical evidence, and that the "totality of
medical evidence indicates [plaintiff] can do simple work, with
restrictions on his social contact and avoidance of work proximal
to available controlled substances."  (Tr. 268).

Plaintiff was seen at Hopewell on several occasions from

November 10, 2009 through July 16, 2010. (Tr. 273-88). On February 10, 2010, plaintiff reported that he had not been sleeping because he could not afford his medicine and therefore did not have any. (Tr. 281). He reported that his application for disability had been denied, and that he had a hearing coming up. (Id.) Plaintiff's mood was depressed, and his affect, activity and speech were normal. (Id.) On March 17, 2010, plaintiff reported being depressed since 2005, when his girlfriend left him and he lost his job. (Tr. 284). He stated that his current medication was not working for him and he was experiencing mood swings, but "denied being depressed saying 'I get depressed only sometimes not always.'" (Id.) He reported feeling isolated while in prison. (Tr. 284-85). He reported that he had been raised by his mother and stated that he had an "alright" childhood. (Tr. 285). He stated that he stopped going to college due to lack of money, and reported that he had not worked in the last ten years. (Id.) Plaintiff was noted to be well groomed and dressed, with a normal content of thought with no signs of hallucinations or delusions. (Tr. 287). His overall mood was normal and his affect was appropriate, although he did occasionally appear frustrated. (Id.) He was fully oriented, he had an average memory and fund of knowledge, and he displayed average insight and judgment. (Tr. 287-88). He was diagnosed with bipolar disorder, schizoaffective disorder with heroin dependence, and high blood pressure. (Tr. 288).

During other visits to Hopewell, plaintiff was repeatedly

noted to have arrived for his appointments on time, to be well dressed and groomed, and to be fully oriented. (Id.) On May 5, 2010, plaintiff was seen by Case Manager Leepi Khatiwada, MSW, QMHP, at Hopewell. (Tr. 277). It was noted that plaintiff arrived on time, was well-dressed and groomed, and fully oriented. (Id.) He exhibited normal thought content and reported that he had been taking his medications. (Id.) He denied concerns regarding sleeping or eating. (Id.) Ms. Khatiwada noted that she assisted plaintiff in "filling out the Bi State application packet and also advised [plaintiff to] get his picture taken to complete the application and assisted with the address for picture." (Tr. 277). Ms. Khatiwada noted that plaintiff was more friendly than during a previous visit. (Id.)

On June 25, 2010, plaintiff presented to the Grace Hill Neighborhood Health Services Clinic (also "Grace Hill") for treatment for hypertension. (Tr. 290). He reported that he had not taken his medication for three weeks, even though he had refills, explaining that he just stopped taking them because he believed he did not need them. (Tr. 290-91). Examination was normal. (Tr. 291). Plaintiff was counseled regarding his need for medication, and was also advised to stop smoking. (Id.)

On July 16, 2010, plaintiff returned to Hopewell for an appointment with a psychiatrist. (Tr. 275). During plaintiff's appointment with Ms. Khatiwada, it was noted that plaintiff arrived on time, was formally dressed in a checked shirt and cotton pants, and had well-managed personal hygiene. (Id.) Plaintiff reported

having met with a social security disability attorney. (Id.) Plaintiff reported needing to see a dentist, and there was some discussion about dental services available on a sliding scale if plaintiff could show "proof of income," but plaintiff apparently declined to go to the Employment Office to get his "proof of income" when Ms. Khatiwada advised him to do so. (Tr. 275-76). Plaintiff "denied any other concerns this day." (Tr. 276).

On November 23, 2010 plaintiff was seen at Hopewell, and his main problems were reported as stress secondary to his living arrangements and concern about getting social security disability. (Tr. 316). He reported auditory and visual hallucinations of decreased nature and intensity. (Id.) He reported feeling agitated over little things. (Tr. 317).

On December 21, 2010 and January 18, 2011, plaintiff returned to the Hopewell Center for an appointment with Ms. Khatiwada. (Tr. 311-15). He was on time, and appropriately dressed. (Id.) He reported medication compliance but complained of poor sleep. (Id.) Ms. Khatiwada noted that plaintiff was friendly to her, and that they discussed plaintiff's concerns about his living situation. (Id.)

On January 28, 2011, a Mental Residual Functional Capacity Questionnaire was completed. (Tr. 293-98). Review of the Questionnaire reveals that it was completed in the same handwriting as Ms. Khatiwada's March 12, 2010 Intake Assessment (Tr. 284-88) and other treatment records of Ms. Khatiwada's, including those reflected in the administrative record at pages 278-280. However,

- 19 -

the signature on the Questionnaire (Tr. 298) does not match Ms. Khatiwada's other signatures. See (Tr. 276, 277, 288, 312, 315, 318, 320). Instead, the signature on the Questionnaire (Tr. 298) more closely matches signatures of Dr. Larice that appear elsewhere in the record. See (Tr. 310, 313).

The Mental Residual Functional Capacity Questionnaire noted that plaintiff had been going through depression and hallucinations which affected his mental functioning and reasoning. (Id.) It identified numerous symptoms attributable to plaintiff, including appetite disturbance with weight change, decreased energy, difficulty thinking or concentrating, paranoid thinking or inappropriate suspiciousness, perceptual or thinking disturbances, hallucinations or delusions, motor tension, inflated self esteem, easy distractibility, sleep disturbance, decreased need for sleep, and loss of intellectual ability of 15 I.Q. points or more. (Tr. 294). The opinion was that plaintiff was either "seriously limited," "unable to meet competitive standards," or had "no useful ability to function" in every mental aptitude necessary to perform unskilled, semi-skilled, or particular types of work. (Tr. 295-96). It is written that plaintiff would have "difficulty following instructions because of low reasoning power." (Tr. 295). It is written that plaintiff lacked patience, was easily anxious or frustrated, failed to comprehend statements, and lacked social skills due to depression and hallucinations. (Tr. 296). It is written that plaintiff's I.Q. level had "been deteriorating." (Id.) It is written that plaintiff had been diagnosed with high

blood pressure and hepatitis C which affected his physical ability. (Tr. 297). It is opined that plaintiff's condition would cause him to be absent from work for more than four days per month and that plaintiff was a malingerer, but that he could manage funds in his own interest. (Id.)

On February 15, 2011, plaintiff was seen by Dr. Larice at Hopewell, and reported that he was fine with no complaints. (Tr. 310). He reported that he was fully compliant with medications, and had no side effects. (Id.) Mental status examination was normal. (Id.) Dr. Larice decreased plaintiff's Seroquel dosage. (Id.)

On March 3, 2011, plaintiff was seen at Grace Hill, and his history was noted to be positive for hypertension, abdominal pain, medication refill, depression, and cough. (Tr. 306). It was noted that plaintiff refused lab work or health maintenance. (Id.) Plaintiff reported that he was single and lived with his sister. (Id.) He reported that he had five sons and four daughters. (Id.) Upon examination, he was noted to be in no acute distress, and well nourished. (Tr. 307). He had pain upon deep breathing, but physical examination was otherwise normal. (Id.) Upon psychiatric examination, it was noted that plaintiff was fully oriented and had a normal affect, but was anxious and did not enjoy things he normally enjoyed. (Tr. 307-08). Plaintiff denied hallucinations and hopelessness, and did not have increased anxiety, memory loss, mood swings, obsessive thoughts, paranoia, pressured speech, and suicidal ideation. (Tr. 308). Plaintiff had normal insight,

judgment, attention span and concentration.  (*Id.*)

### III.    The ALJ's Decision

The ALJ determined that plaintiff had not engaged in substantial gainful activity since the application date of September 8, 2009.  (Tr. 9).  The ALJ determined that plaintiff had the severe impairments of psychotic disorder not otherwise specified, and personality disorder not otherwise specified, but did not have an impairment or combination of impairments that met or medically equaled a listed impairment.  (Tr. 10).  The ALJ determined that plaintiff had the residual functional capacity (also "RFC") to perform the full range of work at all exertional levels, but with the following non-exertional limitations: simple routine tasks with only an occasional change in routine work setting, and only occasional interaction with the public, coworkers, and supervisors.  (Tr. 11).  The ALJ concluded that plaintiff had not been under a disability, as such is defined in the Act, since September 8, 2009.  (Tr. 16).

### IV.    Discussion

To be eligible for Social Security Disability Insurance Benefits and Supplemental Security Income under the Social Security Act (also "Act"), plaintiff must prove that he is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. § 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits his ability to do basic work activities. If the claimant's impairment(s) is not severe, then he is not disabled. The Commissioner then determines whether the claimant's impairment(s) meet or equal any listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to a listed impairment, he is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform his past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other

work in the economy.  If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002).  Substantial evidence is less than a preponderance but enough that a reasonable person would find adequate to support the conclusion.  Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001).  The "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings."  Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted).  The Court must also consider any evidence which fairly detracts from the Commissioner's decision.  Coleman, 498 F.3d at 770; Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999).  However, if substantial evidence exists to support the administrative decision, this Court must affirm that decision even if the record also supports an opposite decision.  Weikert v. Sullivan, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); see also Jones ex rel. Morris v. Barnhart, 315 F.3d 974, 977 (8th Cir. 2003); see also Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000) (In the event that two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole).

In the case at bar, plaintiff claims that the ALJ's

decision is not supported by substantial evidence on the record as a whole, challenging various aspects of the ALJ's credibility and RFC determinations. Plaintiff also argues that, because the ALJ improperly identified the author of the Mental Residual Functional Capacity Questionnaire, his reasons for discounting it were invalid. Plaintiff also states that the hypothetical question the ALJ posed to the VE was inadequate because it was based upon a flawed residual functional capacity assessment, and the VE's testimony therefore cannot constitute substantial evidence supporting the decision. In response, the Commissioner contends that substantial evidence supports the ALJ's decision. Having reviewed the ALJ's decision with the requisite deference, in light of the record and the arguments of the parties, the undersigned has determined that the Commissioner's decision should be reversed, and that this cause should be remanded to the Commissioner for further consideration.

A.   Credibility Determination

While plaintiff takes issue with some of the statements the ALJ made in conjunction with his credibility assessment, plaintiff does not present a fully developed argument challenging the ALJ's credibility determination. However, this Court may review the issue *sua sponte*. See <u>Battles v. Shalala</u>, 36 F.3d 43, 45 n. 2 (8th Cir. 1994). Having reviewed the ALJ's credibility determination, the undersigned concludes that it is not supported by substantial evidence on the record as a whole.

Before determining the claimant's residual functional

capacity, the ALJ must evaluate the credibility of the claimant's subjective complaints. <u>Wagner v. Astrue</u>, 499 F.3d 842, 851 (8th Cir. 2007) (citing <u>Pearsall</u>, 274 F.3d at 1217). The Commissioner's Regulations, and Eighth Circuit precedent, require an ALJ to consider the following factors when evaluating a claimant's subjective complaints: the claimant's prior work record, observations by third parties and treating and examining physicians relating to such matters as the claimant's daily activities, the duration, frequency and intensity of the symptoms, precipitating and aggravating factors, dosage, effectiveness and side effects of medication, and functional restrictions. 20 C.F.R. § 416.929; <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1321-22 (8th Cir. 1984). An ALJ may also consider the absence of objective medical evidence to support the complaints, but may not rely solely upon this factor to discredit the claimant. <u>See</u> <u>Jones v. Astrue</u>, 619 F.3d 963, 975 (8th Cir. 2010) (citing <u>Mouser v. Astrue</u>, 545 F.3d 634, 638 (8th Cir. 2008)).

While an ALJ is not required to explicitly discuss each of the foregoing factors, <u>Goff v. Barnhart</u>, 412 F.3d 785, 791 (8th Cir. 2005), the ALJ is required to make an express credibility determination that explains the reasons for discrediting the claimant's complaints, and in doing so, acknowledge and consider the foregoing factors. <u>Renstrom v. Astrue</u>, 680 F.3d 1057, 1067 (8th Cir. 2012) (citing <u>Partee v. Astrue</u>, 638 F.3d 860, 865 (8th Cir. 2011)(internal citations omitted)).

In the case at bar, the ALJ did not cite 20 C.F.R. §

416.929 or <u>Polaski v. Heckler</u>, nor did he list the factors that are required to be considered in assessing credibility. Instead, to explain his credibility determination, the ALJ wrote:

> [plaintiff's] statements concerning the intensity, persistence and limiting effects of those symptoms are not credible to the extent they are inconsistent with the above residual functional capacity **for four reasons**. First, the limiting effects alleged are unsupported by the objective medical evidence. Second, [plaintiff's] treatment history is inconsistent with the limiting factors alleged. Third, the allegations are vague and equivocal. Finally, the opinion evidence in record establishes that [plaintiff's] residual functional capacity is greater than alleged.

(Tr. 12) (emphasis added).

Elaborating upon his first reason, the ALJ wrote that the evidence established the diagnoses alleged but failed to support plaintiff's allegations "for the vast limited effects of the impairments" and "was not particularly instructive in evaluating the claimant's functional capacity." (<u>Id.</u>) Elaborating upon his second reason, the ALJ wrote that plaintiff's "compliance with treatment is inconsistent with a finding that the claimant is unable to perform any competitive work" and that his lack of compliance lessened his "credibility in his assertion that his medically determinable impairments preclude work." (<u>Id.</u>) For his third reason, the ALJ noted that plaintiff was "unable to provide specific, precise or discernable functional limitations" and had "diminished credibility in the broad conclusion that the claimant cannot work," and noted that vague and imprecise allegations had less evidentiary value than specific allegations of functional

limitations. (Id.) Finally, for his fourth reason, the ALJ wrote
that the opinion evidence indicated a higher level of functioning
than alleged. (Tr. 12).

There appears to be evidence in the record directly
relevant to the factors the Commissioner's Regulations require the
ALJ to consider and which supports the ALJ's ultimate conclusion
regarding plaintiff's subjective allegations. However, the ALJ in
this case explicitly stated that his credibility determination was
based upon four reasons that, while arguably relevant to
credibility determination, do not alone adequately reflect the
factors the Commissioner's Regulations and Eighth Circuit precedent
require the ALJ to consider. Because of this, and because the ALJ
failed to even cite the Commissioner's Regulations or Eighth
Circuit precedent setting forth an ALJ's obligations in assessing
credibility, the undersigned cannot confidently say that the ALJ
acknowledged and considered the required factors before
discrediting plaintiff. It therefore cannot be said that
substantial evidence supports the ALJ's credibility determination
or, by extension, his RFC determination. See Renstrom, 680 F.3d at
1067 (ALJ must acknowledge and consider the required factors in
assessing a claimant's credibility); Wagner, 499 F.3d at 851
(citing Pearsall, 274 F.3d at 1217) (before determining a
claimant's residual functional capacity, the ALJ must evaluate the
credibility of the claimant's subjective complaints). Remand is
therefore appropriate to allow the ALJ to conduct a proper
assessment of plaintiff's credibility. After doing so, the ALJ

will then assess plaintiff's RFC.

Plaintiff argues that, because the ALJ incorrectly identified the author of the Mental Residual Functional Capacity Questionnaire, his reasons for discounting the opinions expressed therein are invalid. As discussed above, there is some uncertainty surrounding this document, but the ALJ did not indicate that he noticed and addressed the uncertainty. While this alone would not necessarily warrant remand, given the other deficiencies in the ALJ's decision, the undersigned cannot confidently say that the ALJ properly considered whether the opinions expressed in the Questionnaire are attributable to Ms. Khatiwada, a Case Manager, or to Dr. Larice, a psychiatrist. Upon remand, it will be for the ALJ in the first instance to do so, and to then determine the appropriate weight to give those opinions.

Plaintiff also contends that the VE's testimony cannot constitute substantial evidence supporting the ALJ's decision because the hypothetical question posed to the VE failed to capture the concrete consequences of plaintiff's impairment. Later in his brief, plaintiff states that the hypothetical question was based upon a faulty RFC. Plaintiff does not specify what concrete consequences of his impairment were not reflected in the hypothetical. On remand, it will be for the ALJ to resolve this issue after properly assessing plaintiff's credibility and RFC.

Therefore, for all of the foregoing reasons,

**IT IS HEREBY RECOMMENDED** that, pursuant to Sentence Four of 42 U.S.C. § 405(g), the Commissioner's decision be reversed, and

this cause be remanded to the Commissioner for further proceedings consistent with this Report and Recommendation.

        The parties are advised that they have until June 13, 2013 to file written objections to this Report and Recommendation. Failure to timely file objections may result in a waiver of the right to appeal questions of fact. <u>Thompson v. Nix</u>, 897 F.2d 356, 357 (8th Cir. 1990).

Frederick R. Buckles
UNITED STATES MAGISTRATE JUDGE

Dated this 30th day of May, 2013.